## MACON GROCERY CO. et al. v. ATLANTIC C. L. R. CO. et al.

(Circuit Court, S. D. Georgia, W. D. August 1, 1908.)

CARRIERS — INTERSTATE COMMERCE—POWER OF COURTS TO ENJOIN ENFORCEMENT OF RATES.

The power given to the Interstate Commerce Commission to determine the reasonableness of rates and establish maximum rates by Interstate Commerce Act Feb. 4, 1887, c. 104, § 15, 24 Stat. 384 (U. S. Comp. St. 1901, p. 3165), as amended by Hepburn Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1907, p. 900), does not deprive a federal court of equity of jurisdiction to enjoin the putting into effect of an interstate rate which is shown or admitted to be arbitrary, unreasonable, and unjust, and to have been adopted through a combination in restraint of interstate commerce, until such rate can be passed on by the commission, where irreparable injury would result to complainants and others affected by such rates if they should be put in force.

In Equity. Suit for injunction.

The complainants are wholesale dealers in groceries, food products, and like commodities in several towns and cities within the territorial jurisdiction of this court. The respondents are certain railway companies organized and existing under the laws of states other than Georgia, but whose lines extend throughout the state, and into the division and district of this jurisdiction. The respondents are common carriers engaged in interstate commerce. They transport grain, flour, grain products, hay, meats, corn, and many other staple commodities from Ohio and Mississippi river crossings from Nashville, Tenn., and other points made with relation thereto, to what are termed "southeastern points of destination." The latter expression includes all points of delivery within the states of South Carolina, Georgia, Florida, and a large

part of Alabama. The respondents, it is charged, are members of what is termed the "Southeastern Freight Association," and this organization constitutes an illegal combination in restraint of interstate trade, for the promotion of monopoly, and for the destruction of fair competition among carriers engaged in that trade. The respondent railway companies, it is alleged, by concurrence of action, and through the medium of this Southeastern Freight Association, can and do fix and maintain rates for transportation of freights from Ohio and Mississippi river crossings to destinations in the states of Georgia, Florida, and South Carolina. One of the respondents, the Louisville & Nashville Railway Company, has continuous lines from Cincinnati, Louisville, Evansville, St. Louis, Memphis, and Nashville to Atlanta. As one of the lessees of the Georgia Railroad, this respondent has entrance into Athens, Macon, and Augusta. The Nashville, Chattanooga & St. Louis Railway maintains and operates a through line from the Ohio river at Paducah, Ky., and from the Mississippi river at Hickman, in the same state, and at Memphis, via Nashville, to Atlanta. Another respondent, the Atlanta Coast Line Railroad Company, is also a lessee of the Georgia Railroad, and has direct connection with the Louisville & Nashville and the Nashville, Chattanooga & St. Louis. Over its own lines of railway it reaches many important destinations in south Georgia and Florida. Another respondent, the Southern Railway, in connection with the Cincinnati, New Orleans & Texas Pacific Railway, maintains and operates through lines from Cincinnati, Louisville, and St. Louis to Atlanta, Macon, Columbus, and other important points within the state of Georgia. The Nashville, Chattanooga & St. Louis Railway Company is owned or controlled by the Louisville & Nashville Railroad Company through the ownership of a majority of its capital stock. The Atlantic Coast Line Company, a holding company, organized under the laws of the state of Connecticut, owns or controls both the Louisville & Nashville Railroad Company and the Atlantic Coast Line Railroad Company.

The Cincinnati, New Orleans & Texas Pacific Railway Company is owned or controlled by the Southern Railway Company, through the ownership of stock or otherwise, and is practically a part of the Southern Railway System. The lines of the companies enumerated are all, by virtue of their location, naturally competitive. There is no other railway system with its own lines extending from Ohio and Mississippi river crossings from Nashville, Tennessee, and points made with relation thereto to destinations in the states of Georgia, Florida, and South Carolina. Because of the advantages afforded by their continuous and controlled lines, the Southern Railway System and the Atlantic Coast Line System can and do fix and maintain the rates between Nashville, Ohio, and Mississippi river crossings, and relative points to all points of destination in the southeastern territory mentioned.

It is charged that any combination, agreement, or understanding between these naturally competitive lines, whereby rates are advanced and maintained, is in suppression of competition.

In the year 1904, and prior thereto, there was much discontent with the rates of freight from eastern and western points of origin to Atlanta and other relative points, including many cities of middle and southern Georgia. Shippers and interested parties sought of the carriers a reduction of rates, and as a result a citizens' committee was appointed by the city council of Atlanta to confer with a committee of traffic officials of railway lines initial at that city. The whole body of rates from eastern and western points of origin was discussed, and a general readjustment resulted from conferences in November and December, 1904. The following reductions from Ohio and Mississippi river crossings to Atlanta were voluntarily accorded by the railroads: Class B, 2 cents per 100 pounds; class C, 2 cents; class D, 2 cents; class F, 4 cents; flour in sacks, 2 cents; fresh meats C. L., 2 cents. Similar reductions were also made to Macon, Columbus, and other points related in rates to Atlanta. It was agreed between the traffic officials of the railroad companies and the Citizens' Committee that the reduced rates were just, reasonable, and compensatory. The companies then prepared and issued, effective February 1, 1905, their freight tariff incorporating these reduced rates, in which, it is charged, each of the respondents to the bill joined and concurred. These reduced rates thus put into effect have since been maintained, under them a large and growing traffic has moved, and they were satisfactory to the shippers and remunerative to the carriers. During the years

in which they have been maintained business and trade conditions became adjusted to the present rates, and all parties interested have prospered thereunder.

Some time prior to the 1st of June, 1908, certain of these carriers began a concerted movement for an increase of the rates established as described. It was essential for the two great controlling systems to unite in the proposed increase. In order to accomplish this, the intervention of the Southeastern Freight Association was sought and employed. As a result the Louisville & Nashville, the Atlantic Coast Line, and the Southern Railway, composing the two naturally competing systems, joined in a declaration. This they filed with the Southeastern Freight Association. It declared that on August 1, 1908, they would make effective an advance in rates on fresh meats, grain products, hay, and packing house products from the producing points above mentioned to southeastern points. These commodities are classified by the Interstate Commerce Commission as "B," "C," "D," and "F." In class B are salt meats in bulk, ham, shoulders, sides, pigs' feet, beef, pork, tripe, sausages, canned meats, fish, lard substitutes, or compounds, cooking oils, products of cottonseed oil or cocoanut oil, and other related articles. On all products of this class the respondents propose an increase in the charges of transportation of 3 cents per 100 pounds. Class C imports flour, if not otherwise specified, in sacks. On the actual weight of this commodity the carriers notify the shipping public of an advance over present rates of 2 cents per 100 pounds. Class D includes such articles as beet pulp, bran, shorts, linseed cake, cerealine (used for brewing), kaffir corn, corn cobs, cotton stalks, excelsior, the fiber of cocoanut and palmetto, animal and poultry food, brewers' grain, grain in sacks, corn, oats, rye, wheat, hay, fodder, straw, husks, shucks, malt, meal of various kinds, middlings, oatmeal, palmetto or palm leaves, peas (cow, clay, or field), peanut cribble, flour, grits, bran, hulls, rice (crystal or prepared), rough rice, rice polished (bran, chaff, and middling), sea grass, sea weed or salt hay, seed cotton (car load), shavings, wood, not otherwise specified, pressed in bales. On all articles of class D the proposed increase is 2 cents per 100 pounds. In class F are to be found the important articles of flour in barrels and half barrels and grits in barrels. Class F, if the respondents' purposes are made effective, will pay an increase of 4 cents per barrel. Fresh meats will pay an increase of 3 cents per 100 pounds; grain and hay, 2 cents per 100 pounds; grain products, 2 cents; and packing house products, 3 cents.

The Southeastern Freight Association, through its chairman, Mr. E. H. Hinton, on June 26, 1908, sent out its manifesto, termed "Information Issue No. 517," which announces the purpose of the defendant companies and of the Central of Georgia Railway Company (which is not a party to this bill) to "advance present rates" on the commodities and in the amounts heretofore described. The manifesto, or "Information Issue," also expressly supersedes the Southeastern Freight Tariff and Information Issues in conflict therewith. It is careful to state that each company acts separately for itself; and with equal care states that the rates, rules, and regulations in this tariff are the "separate" rates, rules, and regulations of each of the carriers named and their connections. It will be observed, however, that there is striking unanimity in the rates. They are communicated to each of the separate lines by the chairman of the Southeastern Freight Association; and it is charged that this effectively suppresses competition, and forces all connecting carriers either to agree therein, or give up the traffic. All interested lines did concur, acting in this regard through the agency of the Southeastern Freight Association. Subsequently the Louisville & Nashville and the Southern Railway filed with the Interstate Commerce Commission their freight tariffs, embodying the advances in rates above mentioned, and gave notice that said tariffs would become effective on August 1, 1908. In each of these tariffs practically every interstate line joined as a participating carrier; the participating lines being 73 in number. The machinery by which the Southeastern Freight Association—alleged to be an unlawful combination in restraint of trade—reaches its effective conclusions, is set forth in the bill. It is charged that the advance in rates is the direct outcome of understandings and agreements in suppression of competition and in unlawful restraint of interstate trade accomplished through this machinery; and that the acts of such combination in

advancing rates are the result of a conspiracy, which is unlawful, as well at common law as under the statutes of the United States.

The proposed advance will affect commodities of prime utility and dai! necessity. The complainants and all dealers in the southeastern states depen very largely for supplies of these commodities upon producing territory reach ed over the lines on which the advanced rates will be demanded. The complainants contend that commodities of this character are entitled to as low a rate as may be consistent with a fair return to the carrier for the transportation rendered, and that the advances will seriously disturb existing trade relations, causing losses to complainants and other dealers, and an increase in the cost of living to the consuming public. The staple articles affected are necessarily and properly sold by the complainants upon a small margin of profit, and the gains result from the large volume of business. It is estimated that the proposed advance will represent a charge or tax to the dealers in the state of Georgia of not less than $500,000, and probably exceeding $1,-000,000 annually. The consuming public will be forced to bear some portion of the additional tax represented by the proportional increase in the price. While considerable traffic will continue, the increased rates will inevitably restrict its volume, reduce the business of complainants and other dealers, and deprive the public or some part thereof of the ability to purchase and use these commodities, to the irreparable loss and injury of complainants and others similarly situated, and to the prejudice of the public interest. The legal remedy, it is stated, is inadequate, for the reason that there will be a constantly recurring grievance incapable of pecuniary estimation. The enforcement of the right of reparation in damages will bring about a multitude and multiplicity of suits. It is not a compensatory charge to fairly meet the cost and value of the services to be performed by the defendants and other carriers, but the advance is an arbitrary and unlawful exaction. The voluntary establishment of reduced rates following the Atlanta conferences, and the maintenance of these rates for more than four years, is alleged to be an admission and declaration on the part of the carriers that such rates were reasonably high and compensatory under normal conditions. The carriers prospered until the financial panic of October and November, 1907. While there was some loss then, all lines and classes of business and industry also lost. Now, there is a decided advance in the prosperity of the country, and the net earnings of the defendants and other carriers in recent months have largely increased, in some cases showing net earnings exceeding those of corresponding months of the preceding year. But the carriers have no right to take advantage of an abnormal condition, which is necessarily transitory, nor to make advances in rates upon commodities, which are the necessities of daily life.

Following these averments, the complainants pray that an injunction pendente lite shall be issued, and that the defendants and each of them shall be temporarily restrained from putting into effect the proposed increase of rates, to be made effective August 1, 1908, from Ohio and Mississippi river crossings, and points made in relation thereto, to all points in the state of Georgia affected by said advance; and that, upon the final hearing, a decree perpetually enjoining said advance may be made effective. Discovery is prayed, in order to obtain certain evidence, in the possession of the defendants, to prove certain averments of the bill. There is a prayer for general relief, and the usual prayer for process. The bill is properly verified.

On Saturday, the 25th of July, the bill was presented for the consideration of the court. A temporary restraining order was then issued, and the hearing thereon was fixed for the ensuing Wednesday, the 29th inst., in order that the facts might be heard, and, if possible, the matter in issue determined before the date fixed for the advance of rates. The hearing began on the morning of the 29th, and was concluded about noon on the 30th. In view of the importance of the issues involved, the court took a short time for consideration.

The respondents first interposed pleas to the jurisdiction. These were overruled upon the grounds stated in the oral opinion (a report of which may be found in the record), except as to the plea of the Cincinnati, New Orleans & Texas Pacific Railway Company. Since this company had not been actually served, the court took its plea under consideration; and, if service is not promptly effected, no order affecting its interests will be granted.

The respondents filed no answer, and introduced no proof whatever, but relied solely upon a demurrer, signed by the solicitors for all of the defendants. This may have the effect of waiving their pleas to the jurisdiction, in so far as they relate to the contention that the respondents can only be sued in the circuits or districts of which they are inhabitants. The demurrer, however, denies the jurisdiction of the court as a court of equity, denies that there is equity in the bill, insists that it is not competent for the complainants to raise any question as to the rates of interstate transportation, unless some representative of the public is a party to the record, or unless the Interstate Commerce Commission has passed upon the rates. The demurrer also alleges that there is an adequate and complete remedy at law. These grounds are amplified in several paragraphs.

In support of the averments of the bill, certain affidavits and other documentary evidence were offered. A printed copy of the record in the Supreme Court of the United States in the case of Southern Railway Company v. Tift and Others, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124, was also offered, in order that the court might understand the character of the Southeastern Freight Association, and the methods by which advances affecting interstate trade were made by the railways combining to form that association. This record contained the charter and other documentary evidence, used before this court at a former hearing in the Tift Case, relating to this association. No objection was made to the use or competency of such evidence in the present hearing.

Objections were made to the competency of certain documentary evidence offered by the complainants. The court holding that the objections went rather to the sufficiency than the admissibility of the testimony, no exceptions were noted to the rulings admitting such evidence. The only exception was made to the ruling of the court sustaining the demurrers of complainants to the respondents' pleas to the jurisdiction.

The respondents declined to introduce proof of any sort. Since, therefore, the evidence presented by the complainants has not been in any manner contradicted or explained, it must be taken as true. The proof offered was substantially as follows:

The complainants first introduced certain evidence as to the conditions under which the present rates sought to be advanced came into existence. Mr. W. E. Newill testified by affidavit that he was a member of a joint conference committee, which was appointed by the mayor of Atlanta to confer with representatives of the Nashville, Chattanooga & St. Louis Railway Company, the Southern Railway Company, and other carriers. A conference took place at the Piedmont Hotel, in Atlanta, during the months of November and December, 1904. Mr. Oglesby, the chairman, for the city council and in behalf of the manufacturing and jobbing interests of Atlanta, stated their grievances to the representatives of the railroads. Among the causes of complaint were the excess rates which were charged Atlanta merchants over those charged to merchants in Birmingham, Ala. The negotiations proceeded, and on December 6th Mr. J. M. Culp, an officer of the Southern Railway, reported the result, in part as follows:

"It was the consensus of opinion that the reductions to Atlanta from the West would carry with them corresponding reductions to these points, which have been specially related to Atlanta, such as Macon, and Athens, and Apgusta, and Columbus; and, that the rates from the East to Atlanta being reduced in line with the reductions from the West to Atlanta, there would be some reductions to some points in the southeast. To some of the points in the southeast, from the east, the reduction would not be as great as the reduction to Atlanta. * * * Now, to intermediate points, there are some points, competitive points, to which the rates bore a fixed relation to the rates to Atlanta, or some other point that in itself has a fixed relation to Atlanta, and those would be correspondingly reduced."

Another officer stated the concession determined upon by the officials of the railway companies:

"The reduction proposed on first class is nine cents. The reductions are not uniform throughout the first six classes; the reduction on sixth class being five cents, and on third class only three cents. The uniform reduction on meat,

grain, and flour is two cents per 100 pounds. The rates proposed from Cincinnati, Louisville and the other Ohio river crossings on the first six classes are proposed on the first six classes from Baltimore. * * * "

Mr. Culp, of the Southern Railway, then added that a revision of rates in line with these reductions would be made throughout the commodity list, and said:

"I don't think there is any doubt but what there will be a reduction made on a considerable number of those commodities. * * * "

Mr. H. F. Smith, the representative of the Nashville, Chattanooga & St. Louis Railway, then stated before the conference committee:

"I would answer that, with the permission of my associates, by saying that those interested in the Atlanta rates reached a compromise with those not having direct interest in the Atlanta rates. I refer to other carriers, carriers whose paramount interest was with other communities. These figures that we submit here to you were considered by those other interests, representing those other communities; and concurred in."

The bases upon which the rates were put in as the result of the Atlanta conference Mr. Newill further testified were fully considered by the highest officials of the roads at their representative meeting. It was estimated that the amount of flour, hay, grain, and mill feed coming to Atlanta alone was about 12,000 cars of 20 tons each per annum. The new rates were made effective February 1, 1905.

Extracts from "Poor's Manual of Railroads," which it was testified is an authoritative treatise on the subject, were then introduced. These all tended to show that the defendants were grouped, as the bill alleged, into two great systems, the one controlled by the Southern Railway Company, and the other by the Atlantic Coast Line Company, and that the lines of the defendants extended throughout all the territory described in the bill.

Mr. H. T. Moore testified in an affidavit that he is the traffic manager of the Atlanta Freight Bureau, and is familiar with freight rate tariffs. He has examined the freight rates which were of force prior to January 1, 1905, and the Atlanta conference, the rates made effective thereafter on February 1, 1905, which are the present existing rates, and the rates proposed to become effective on August 1, 1908. He makes a comparison of these rates from certain Ohio river crossings, viz., Cincinnati, Evansville, and Louisville. to Albany, Cordele, Dublin, Macon, Valdosta, Atlanta, Athens, Columbus, and Rome, all of which will be affected by the proposed increase. To the city of Macon for the commodities included in Class B the rate prior to 1905 was 37 cents per 100 pounds; the present rate is 35 cents, and the proposed rate is 38 cents, showing an advance of 3 cents per 100 pounds above the freight now paid by the complainants, and 1 cent per 100 pounds above that paid in 1904. For classes C and F the rates will revert to those paid in 1904, but these will be an advance above the present rates of 2 cents, 2 cents, and 4 cents for the respective classes. For Valdosta merchants there will not only be advances of 3, 2, 2, and 4 cents for classes B, C, D, and F, above the present rates, but for classes B, C, and D an increase of 1 cent per 100 pounds above those paid before the Atlanta agreement. For Atlanta merchants the increase over the present rates will be 3 cents for Class B, 2 cents for C, 2 cents for D, and 4 cents for F, and for Class B the proposed advance is 1 cent per 100 pounds in excess of the freight paid in 1904. For Athens merchants there will be the same increase of 3, 2, 2, and 4 cents above present rates, and 1 cent for Class B, and for Columbus and Rome merchants the same advances. In shipments of fresh meats for all of these cities the increase is 3 cents per 100 pounds above present rates, and 1 cent per 100 pounds above those effective in 1904. The freight on flour in sacks is increased 2 cents above the present cost, and for Valdosta 1 cent per 100 pounds over that in 1904. There are the increases which the complainants contend are illegal.

A report of certain proceedings before the Railroad Commission of Georgia was presented, and extracts were read, showing the relative gross and net incomes of the Southern Railway for the months of March, April, and May, 1908, as compared with the earnings for the same months of 1907. Mr. J. M. Culp of the Southern Railway was questioned by Mr. Callaway of the Railroad Commission of Georgia. For March, 1908, he said the net earnings were

$1,067,000, and for March, 1907, $813,000, showing two hundred and odd thousand dollars increase. For April, 1908, the net earnings showed an increase of $339,000 over those for April, 1907, and for May an increase of $90,000. These results he said were accomplished by a drastic reduction of expenses; that the year ending June 30, 1907, while the greatest gross year, was not the greatest net year of the company, and that it was exceeded by the year 1908. Mr. Culp then stated that the net earnings of the railway in Georgia showed a decrease in July, 1907, of $89,500; in August, $90,300; in September, $51,500; in October, $92,000; in November, $68,000; in December, $82,500; in January, 1908, $76,000; in February, $55,000; in March, the small decrease of $1,146; and in April an increase of $24,000. These statistics it is contended show that the financial conditions which grew out of the recent panic are rapidly improving, that the earnings of the defendants are increasing, and do not justify the imposition of such burdens on complainants and the public as are attempted by the proposed advances.

Cumulative evidence was offered on this line, in the nature of extracts from the financial news published by the "Atlanta Journal," giving the quotations of the stocks of the different defendant companies for the 15th day of each month, beginning with July 15, 1907, and ending July 15, 1908. A brief summing up of the statements in this affidavit shows that the quotations of Atlantic Coast Line preferred stock on July 15, 1907, was 98; in August, 77¼; September, 82; October, 70¼; November, 64¼; December, 65½; January 15, 1905, 72½; February, 63; March, 65; April, 73; May, 90; June, 90; and July, 92. For Louisville & Nashville preferred the quotations for these months ran, respectively: 117, 104, 108, 100¼, 93½, 90, 100⅞, 89¾, 96½, 99, 109½, 107¼, and 108⅞. For Southern Railway common stock: 20½, 16½, 15½, 11⅝, 12, 12⅞, 10⅛, 9⅞, 11, 13¾, 17⅞, 17⅜, 17⅞. For Southern Railway preferred: 56, 55⅞, 46, 37½, 39¾, 35, 31½, 29⅛, 39¼, 44⅞, 45½, 45½. These figures indicate that, while the stocks of these companies showed great depression during the late fall and winter under the effects of the panic throughout the country, their value during the last three months has rapidly increased to a normal condition.

In further proof of their contention that the proposed increases are arbitrary and not justified by business conditions, extracts were introduced by the complainants from "The Commercial & Financial Chronicle," published by William B. Dana Company of New York, and sworn to be a reliable financial journal, whose statements are accepted as correct by stockbrokers and the public generally. By this the range of prices and the sales of the stocks of the respective defendants were shown for different periods in 1907 and 1908. For the Atlantic Coast Line Railroad the lowest price of 59½ for 1908 was on March 2d; while the highest price of 96 was on July 21st. For 1907 the price was as high as 133⅛ in January, but it went to as low as 58 in November. On Friday, July 24, 1908, the lowest price was 94, and the highest 95, while for the week ending on that day 4,035 shares were sold. For the Louisville & Nashville Railroad Company these statistics show that the lowest price of its stock for 1908, 87¼, was on February 19th, and the highest price of 113 was on May 19th. For 1907 it went as high as 145⅛ in January, but dropped to 85½ in November. During the week ending July 24th the prices ranged from 107½ minimum to 111⅜ on July 23d, while 12,000 shares were sold. For the Nashville, Chattanooga & St. Louis the lowest price of stock for 1908, 97¾, was on January 2d, and the highest price of 120 was on July 24th. For 1907 it went to 147 in January, but fell to 97 in December. One hundred shares were sold for the week ending July 24th. For Southern preferred the lowest price for 1908, 25½, was on March 5th, and the highest of 50½, on July 21st. For 1908 the lowest, 29½, was in November, and the highest, 94½, as in the case of the other companies, was in the opening of that year in January. During the week stated 36,800 shares of what is termed "common stock," and 10,075 shares of preferred stock, were sold. This data all tends to show a gradual increase of the stocks from November of last year, when they reached their minimum value. For all of these companies save one the maximum prices of their stocks were reached during the week prior to this hearing, and the last week for which the statistics of this journal have been compiled. For the Louisville & Nashville,

while the maximum of 113 was reached in May, yet on July 23d the price was 111⅜, and on July 24th, 110, only a few points below the maximum attained during this year.

As significant of the general improvement of financial conditions throughout the country the complainants submitted data showing the bank clearings of the large cities in different sections. Thus New York, Philadelphia, and Pittsburg are classed among the "Middle Group." The figures for this group show a decrease of 9.1 per cent. in the returns for the week ending July 18, 1908, from those of the same week in 1907. The "New England Group," including Boston, Hartford, New Haven, and other cities, shows a decrease of 3.5 per cent.; the "Western Group," including Chicago, Cincinnati, Cleveland, and others, a decrease of 2.7 per cent.; the "Pacific Group," including San Francisco, Los Angeles, Seattle, Portland, and others, a decrease of 13.2 per cent.; another "Western Group," including Kansas City, Minneapolis, St. Paul, and Lincoln, a decrease of 3.8 per cent.; and the "Southern Group," including St. Louis, New Orleans, Louisville, Atlanta, Savannah, Macon, Columbus, Memphis, Nashville, Mobile, Birmingham, and practically all our large Southern cities, a decrease of 7.6 per cent. For the entire country, the average decrease in clearing house returns over last year is 7.8 per cent.

Illustrative of the earnings of the defendant railways, the certificate of the secretary of the Railroad Commission of the state of Georgia was introduced. The Western & Atlantic Railroad, of which the Nashville, Chattanooga & St. Louis Railway is a lessee, and the Louisville & Nashville Railroad has trackage rights, from July, 1907, to May, 1908, inclusive, made a net profit of $633,-907.76, and for the same months of 1906 and 1907 $592,475.31, and for the same months of 1905 and 1906 $625,792.06.

Mr. W. E. Small, general manager of the A. B. Small Company, one of complainants, testified that he is a wholesale dealer in hay, grain, flour, meats, and other articles on which the advances in rates are threatened. He has made a careful estimate of the extent to which the advances will affect his business on the basis of the volume of business transacted by the company in 1907. The increased rates which his company will have to pay per annum, if the advances are made effective, will be $4,619.72. He estimates that the total amount of advances which would have to be paid by the merchants in the city of Macon would be $65,000, and in the state of Georgia $750,000, per annum. Following the Atlanta conference in 1905, and the subsequent decrease of freights, he says that a large traffic has moved, and conditions have become so adjusted to the trade that to change the present rates would disturb trade conditions and existing contracts based on those rates, and cause a serious loss both to consumer and dealer. The margin or profit to the dealer in the commodities affected is very small, and, while it would be possible for him by increasing the price to absorb a part of the increase in freight rates, and pass the same along to the consumer, it would be impossible, at least until conditions adjusted themselves, to absorb the entire increase in these freight rates, and in this manner a large loss would ensue to the dealer and consumer. He states that the largest part of the supply of commodities to this state comes from points beyond the Mississippi and Ohio rivers, and is affected by the threatened advance. While it is true that following the financial panic in the fall of 1907 there was a general business depression, trade in the commodities affected is rapidly assuming a normal condition, and in the opinion of the deponent a vast amount of tonnage will move from the West to the state of Georgia.

To the same effect was the testimony of Mr. R. C. Corbin, the manager of the Macon Grocery Company in the city of Macon. He estimates the loss of the company at $6,000 per annum, and of Macon merchants at $35,000 per annum, and of merchants throughout the state at $500,000.

Mr. A. C. Wooley, of A. C. Wooley & Co., testified that in 1907 his company received 7,800,000 pounds of the products on which the proposed advances are sought to be made, and that he estimates the additional cost per annum at $1,560. Mr. Thomas E. Rogers, of Kelly Bros. Company, estimates the amount received by his firm at 13,685,927, at an increased cost of $2,737.18. Mr. Cone M. Maddox, of J. J. Maddox Company, states the quantity at 5,000,000, and the amount at $1,000. Mr. R. W. Davis, of R. W. Davis & Co., at $1,000; Mr.

E. L. Adams, of Adams, Whitney Company, at $457.77; Mr. W. S. Duncan, of W. S. Duncan & Co., at 60,669,693 pounds, and $12,133.93; Mr. F. B. Coleman, of McCord, Stewart & Co., at 23,429,536 pounds, and $4,685.81; and Mr. A. P. Morgan, of A. P. Morgan Grain Company, at 34,500,000 pounds, and $6,900. The complainants then closed.

W. A. Wimbish, Edgar S. Watkins, and Alexander Akerman, for complainants.

Henry L. Stone and Ed Baxter, for respondent Louisville & N. R. Co.

Claudian B. Northrop and Sanders McDaniel, for respondent Southern Ry. Co. and Cincinnati, N. O. & T. P. R. Co.

George B. Elliott and Robert C. Alston, for respondent Atlantic C. L. R. Co.

Claude Waller, J. D B. De Bow, and John L. Tye, for respondent Nashville, C. & St. L. Ry. Co.

Ed Baxter and Sidney F. Andrews, special counsel for all respondents.

SPEER, District Judge (after stating the facts as above). It is most significant that, while there were in attendance on the hearing at Mt. Airy, a large number of counsel and railway officials of great experience, extensive knowledge, and high rank, no sort of effort was made to contradict or explain any of the evidence offered by the complainants. The court was furnished neither with affidavits, oral testimony, nor explanations relating to the grave and serious complaints set forth in the complainants' bill and supported by proof. The respondents were content to rely on their demurrer, and the argument was restricted to the following points: First, that the court had no jurisdiction; second, that the Interstate Commerce Commission has no jurisdiction with regard to these rates; and, third, that, if the new rates were put into effect, it would merely restore the rates which existed prior to 1905, and that such rates are reasonable. The last point is a question of fact, not raised by answer or in any appropriate form. It does not appear in the record, nor, if the pleadings and proof justified a consideration of this assertion, would it appear material to the present inquiry at this stage of the case.

A condensed statement of the case will, it is thought, suffice to ascertain the rights and responsibilities of the parties as they appear from the record. It is insisted that the court is without jurisdiction to stay the enforcement of rates confessedly imposed by a confessedly unlawful combination in restraint of trade which will in all likelihood withdraw and withhold for many years from the resources of complainants many thousands of dollars thus exacted, and during all of this time give the use of such sums to the respondents, with a consequent disorganization of business, increase in the price of living, diminution in the profits of the manufacturer and producer, decrease in the purchasing capacity of the salary or wage earner, and a possible paralysis of that recuperative movement which elevates and brightens the hopes of the people at this time. This contention is based upon the assertion that a circuit court of equity of the United

States has no jurisdiction to accord the relief, or any effective part of the relief sought by this bill. The proposition of the respondents is based upon a bold and unqualified denial of any judicial power in this country to restrain any rate, however enormous it may be, levied for transportation in interstate commerce, no matter how flagrantly in violation of the interstate commerce law, or the penal statutes of the United States, that imposition may be. The position of the respondents is made clear by the following colloquy between the court and their counsel:

"Judge Speer: You stated yesterday these shippers cannot sue in the state courts?

"Mr. H. L. Stone: They cannot sue anywhere until the Commission has passed upon it. * * *

"Judge Speer: You might then increase the rate 50 per cent. or to any amount and the shipper has no redress?

"Mr. Stone: We may assume many impossibilities.

"Judge Speer: Then the whole power is with the railroads, and the people are absolutely helpless?

"Mr. Stone: Not at all, sir; I do not concede that. Congress has prescribed these particular regulations to regulate commerce, and they must be regulated accordingly, and not otherwise. A rate, so far as it is initial is concerned, is left to the carriers by Congress. Congress could prescribe rates itself, if it was desired to do so, if it was thought wise for all of these carriers to observe. It delegated to the Commission the power on complaint, after full hearing, to substitute a rate of freight for the one fixed by the carriers. * * * In the meantime Congress has provided in its wisdom that those rates thus initiated and put into effect by the carrier itself, not by Congress, and not by the Commission, should be the only legal rate, and that no more, no less, or different rate can be collected by the carrier. * * *

"Judge Speer: You collect say from a Georgia shipper this increase of rate; his only right of redress is a suit against your railroad?

"Mr. Stone: After the Commission has held the rate to be unreasonable, and fixed the amount of his damages, and allowed the carrier a certain time in which to pay it. Then he can go into court. * * *

"Judge Speer: Then you contend that the only district in which (the carrier) may be sued is in the district of which he is an inhabitant?

"Mr. Stone: That is in a suit for an award of damages. There is no provision in the interstate commerce act that the shipper may file an injunction suit in a district outside of that in which the carrier has his principal operating office, or in which he is an inhabitant.

"Judge Speer: Then the American people are in the attitude in relation to the railroads that the railroads can levy any rate, whatever they choose to levy, no matter how extravagant they may be, and no individual has any redress until he has prosecuted his case before the Interstate Commerce Commission, and until he has then prosecuted it further before a United States court having jurisdiction; that is to say, where the railroad is an inhabitant. In the meantime the railroad company can keep his money, and the money of everybody in like standing?

"Mr. Stone: Unquestionably, sir; and, if there is any fault with that system, the complaint should be made to Congress for amendments to the acts, and not to the court."

It follows that, if the proposition of respondents on this subject is maintainable, all that the genius of executive statesmanship, the assiduity and learning of jurists, and the patriotic purposes of Congress have attempted toward the settlement of the vast controversies involved in the regulation of interstate commerce will be profitless and indeed impotent. While this is true, the varied, conspicuous, and combined mentality of those distinguished corporate specialists, who, like

the Choros of the Greek tragedy, clustered about the Choryphœus of the drama, played in the humble schoolhouse of this mountain village, was able to point out not one controlling precedent for a contention so vital to the future of the country. Precedents, it is true, were cited, but at a glance they are distinguishable from the case before the court and the decisions of the Supreme Court of the United States and the other courts which uphold the jurisdiction assailed. The first and the most important of these is the case of the Texas & Pacific Railway Company v. Abilene Cotton Oil Company, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553. What seems the cardinal error of the learned counsel for the respondents in his attempt to apply this precedent to the case at bar is that he fails to distinguish between an action in a state court at common law and a suit in equity in a Circuit Court of the United States. The distinction is discoverable, and we believe is generally understood. In the Abilene Case the Oil Company brought an action at law to recover $1,951.83. This sum had been exacted over the protest of the company for the shipment of car loads of cotton seed. Among other defenses the railway company defended on the ground that the shipments were interstate, and were, therefore, governed by the act of Congress to regulate commerce. The rate had already been established, and it had not been pronounced unreasonable by the Interstate Commerce Commission. The trial court of first instance made findings of fact: (1) That this was an interstate shipment; (2) that the defendant complied with the interstate commerce law, except that the rates were excessive; and (3) that the rate charged by the defendant was that established under the interstate commerce law. But it held that the plaintiff could not recover. It was a Texas case, and the Court of Civil Appeals of that state reversed the decision of the trial court, and found but one question essential for its decision. That was "whether, consistently with the act to regulate commerce, there was power in the court to grant 'relief' upon the finding that the rate charged for the interstate shipment was unreasonable, although such rate was the one fixed by the duly published and filed rate sheet, and when the rate had not been found to be unreasonable by the Interstate Commerce Commission." The court then proceeded to grant what it termed "relief," which was a judgment for the excessive freights charged. The Supreme Court in a very clear and strongly reasoned opinion by Mr. Justice White reversed this conclusion. Throughout the opinion, the observations of the learned justice were directed exclusively to actions at law for damages, and attempts to obtain pecuniary reparation; in other words, to actions at common law, and indeed, to such actions in state courts. Again and again he reiterates the inimical effect upon the interstate commerce laws enacted by Congress of the action of "courts and juries" in different states. He sums up the conclusion of the court, as follows:

"In other words, we think it inevitably follows from the context of the act that the independent right of an individual originally to maintain actions in courts to obtain pecuniary redress for violations of the act conferred by the ninth section must be confined to redress of such wrongs as can, consistently with the context of the act, be redressed by courts, without previous action by the commission, and therefore does not imply the power in a court to primari-

ly hear complaints concerning wrongs of the character of the one here complained of" [i. e., a claim for damages at common law].

The cases cited by the learned associate justice in support of his conclusions also clarify the differentiating view between that case and the case at bar. Swift v. Philadelphia, etc., Ry. Co. (C. C.) 64 Fed. 59, was an action at law to recover damages. So, also, in Gulf, Colorado, etc., Ry. Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910, the carrier refused to deliver, because the shipper would not pay a higher established schedule rate than that specified in the bill of lading. The judgment of a state court enforcing the penalty was reversed upon the ground that the state statute was repugnant to the act to regulate commerce. In Texas & Pacific Ry. Co. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011, also cited by the associate justice, a recovery at law of the excess freights above the quoted rate was allowed by the Texas court. The Supreme Court reversed this judgment. The upshot of the Abilene Case and of all the decisions cited by the learned justice sustains the counsel for the respondents in his unreserved proposition that the shippers have no relief whatever at common law in the courts of a state against exactions, however unwarrantably made by the carriers of interstate commerce. Let us see, however, whether this dominating principle is applicable to a case like that before this court, where a number of shippers seek to prevent, by resort to the strong and flexible powers in equity of courts of the United States, the imposition of rates declared and admitted to be unreasonable, and confessedly (for the demurrer confesses it) imposed in violation of the anti-trust law, denouncing combinations in restraint of trade and commerce.

The Abilene Cotton Oil Company Case which we have been discussing was decided February 25, 1907. On May 27th of the same year the Supreme Court had under review from this court the case of the Southern Railway Company v. Tift, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124, otherwise known as the "Lumber Rate Case." In the Tift Case, in the Circuit Court, the identical objection for want of jurisdiction with which the complainants are here confronted was presented in several hearings. There, too, when the bill was filed, the rate had not been enforced. As in the case at bar, it had been merely threatened. The case may be found reported in 123 Fed. 789, and the decision in the second and final hearing in 138 Fed. 753 (2 Federal Anti-Trust Decisions; p. 733). Said the court in the first of those cases:

"It is, however, insisted that this power of the court cannot be exercised until the Interstate Commerce Commission has acted, but that Commission is expressly denied the power of injunction, or any judicial power. This it has been conclusively held remains with the courts. Interstate Commerce Com. v. C., N. O. & T. P. R. Co., 167 U. S. 479, 17 Sup. Ct. 896, 42 L. Ed. 243. How, then, can it be said that the original and plenary power of the court of equity in such matters must be postponed to await the action of the Interstate Commerce Commission? It is true that the statute regulating interstate commerce permits a resort to the common-law action for damages for violation of its provisions, and it is urged that this remedy is exclusive. This does not follow. In the nature of things, there must be a vast variety of controversies in which the remedy at law on an action brought by the individual wronged is utterly inadequate to afford relief either to the individual, or to multitudes who are in similar case with him. It is often in the power of a railroad company to

greatly injure, or wholly destroy, one's business, or a general business of a particular class. In such case injunction would be the appropriate remedy. So an injunction is granted to prevent illegal discrimination, and illegal exactions in excess of rates fixed by law. This is upon the ground, in part, that, the injury being a constantly recurring one, there is no adequate remedy at law. 1 High on Injunc. § 616, etc. * * * It may safely be declared that a Legislature will never be presumed to have denied by implication those general powers of a court of equity, which have been ingrafted in our jurisprudence 'for the correction of that wherein the law, by reason of its universality, is deficient.' Because one special remedy has been afforded it does not follow that the general powers of equity are annulled."

The case of United States v. Union Pacific R. Co., 160 U. S. 1, 16 Sup. Ct. 190, 40 L. Ed. 319, was cited, and the language of the court quoted as follows:

"It is not enough that there is a remedy at law. It must be plain and adequate, or in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity."

Numerous other authorities were cited in support of these propositions. It follows that the challenge to the jurisdiction could not have been more definitely made, or more definitely decided. We have seen that jurisdiction was maintained. An appeal was then taken to the Supreme Court of the United States. Now, there is nothing about which that great court is more sensitive than an unauthorized exercise of jurisdiction on its own part, or on the part of any of the "inferior courts" created by Congress. It has often held that it is the duty of such courts sua sponte to raise the question of jurisdiction, even though the parties should fail to do so. No failure of jurisdiction can escape the perspicacity of that august tribunal. Its holding, then, in the Tift Case seems conclusive of this controversy. Said Associate Justice McKenna for the court (Southern Ry. Co. v. Tift, 206 U. S. 437, 27 Sup. Ct. 711, 51 L. Ed. 1124):

"In the case at bar * * * there are assignments of error based on the objections to the jurisdiction of the circuit court. These might present serious questions, in view of our decision in Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, upon a different record than that before us. We are not required to say, however, that because an action at law for damages to recover unreasonable rates which have been exacted in accordance with the schedule of rates as filed is forbidden by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates, or a change to unjust or unreasonable rates."

What fairer or more obvious distinction has been indicated by the Supreme Court? In the Abilene Cotton Oil Company Case, in an action at common law, they denied jurisdiction. That was a different record from this before them, but because of that decision they were not required to say that "a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates, or a change to unjust or unreasonable rates." If the court had been so required, it would have made the requirement effective. The absence of jurisdiction and the requirement are one and the same thing. Since the great tribunal was not so required, there is no law to forbid a suit in equity "to prevent a filing or enforcement of a schedule of unreasonable rates, or a change to unjust or unreasonable rates."

The demurrer here admits the case before us to be a suit of that precise character. The learned counsel who argued this question had much to say of the difference between the record in the Tift Case and the record in the case now before the court, and much to say of the remarkable care of counsel to keep out of the record in this case certain features which appeared in the record of the Tift Case. It will be difficult, however, to eliminate the fundamental question of jurisdiction, which was raised in both, and which the Supreme Court would have raised if the parties themselves had not raised it. It is true, as stated by the learned counsel for the respondents, that something was said about the stipulation in the Tift Case by Associate Justice McKenna. But the stipulation only related to reparation, and to the admission of evidence. No stipulation, however, could have given the court jurisdiction. This has been repeatedly held. The jurisdiction of the court in equity and its jurisdiction as a court of the United States is thus immovably fixed. It is true that, because the railroads there promised to pay back to the shippers the sum total of the excess charges, the court did not grant the injunction, but it is not unsafe to say that save for that stipulation the injunction against the increase would have been promptly granted. The case was sent to the Interstate Commerce Commission, and its assistance invoked. Upon this the Supreme Court observes (page 437 of 206 U. S., page 711 of 27 Sup. Ct. [51 L. Ed. 1124]):

"The Circuit Court granted no relief prejudicial to appellants on the original bill. It sent the parties to the Interstate Commerce Commission, * * * *" etc.

But, if we were without the assistance of the paramount authority of the Supreme Court, abundant support of the jurisdiction may be found in the decisions of the Circuit Courts and the Court of Appeals of our own circuit. In the case of Blindell v. Hagan et al. (C. C.) 54 Fed. 40, that brilliant lawyer and jurist, the late Judge Billings, while holding that the anti-trust law alone did not authorize the bringing of injunction suits, or suits in equity by parties other than the government, yet he maintained the jurisdiction of the Circuit Court to enjoin a combination of persons from interfering with the rights of a party, in order to prevent a multiplicity of suits at law, and for the reason that damages at law for interrupting business and interstate profits of pending enterprises must be conjectural, and not susceptible of proof. Quoting from Fonblanque's Equity, at page 3, the learned judge said:

"The foundation of this jurisdiction of equity is the probability of irreparable mischief, the inadequacy of a pecuniary compensation, and the prevention of a multiplicity of suits."

An appeal was taken to the Circuit Court of Appeals, Circuit Judges Pardee and McCormick and District Judge Toulmin presiding, and that court maintained the jurisdiction on the general principles of equitable jurisdiction.

In the case of Gulf, C. & S. Ry. Co. v. Miami Steamship Company, 86 Fed. 421, 30 C. C. A. 156, the Circuit Court of Appeals of the Fifth

Circuit, Circuit Judges Pardee and McCormick and District Judge Swayne presiding, declared:

"We do not doubt the general jurisdiction of the Circuit Court as a court of equity to afford preventive relief in a proper case against threatened injury, about to result to an individual from any unlawful agreement, combination, or conspiracy, in restraint of trade."

Judge McCormick for the court, in a strong and carefully considered opinion, refers to the case of In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092. There the Circuit Court had rested its jurisdiction mainly on the anti-trust law, but the Supreme Court—to use the language of Judge McCormick—"entered into no examination of that act, preferring to rest its judgment on the broader ground of the general jurisdiction of a court of equity to prevent injury in such cases." "The Supreme Court," however, he continues, "was careful to observe that it must not be understood from its putting its judgment on the broader ground that it dissented from the conclusion of the Circuit Court in reference to the scope of the act."

We understand, although the opinion has not been reported, that a similar conclusion has been reached by Judge Cornelius H. Hanford of the District of Washington in a case of a threatened advance of rates from points on the Pacific Coast.

In a recent case, Kiser Co. v. Central of Georgia Ry. Co. et al., 158 Fed. 193, decided by Judge Newman at Circuit in the Northern District of Georgia, an analysis of the Abilene Cotton Oil Case and of the Tift Case was given by that eminent jurist. He remarks:

"From what is said in both cases the ruling would seem to be that general power over interstate rates, to be charged by common carriers, is given to the Interstate Commerce Commission, and that for the courts to undertake to determine what are reasonable or unreasonable rates would interfere and conflict with the exercise of this power by the Commission, although instances might arise in which it would be proper for a court of equity to enjoin the enforcement of unreasonable rates, or a change to unjust or unreasonable rates. * * * This action of a court of equity will not interfere with the final exercise by the Interstate Commerce Commission of the full powers granted to it by the act of Congress of 1887 * * * or under the act of June, 1906, 'to determine and prescribe what will be a just and reasonable rate, charge, or charges, to be hereafter observed as a maximum to be charged.' This seems to be the clear meaning of these decisions. It appears, therefore, that the court might properly enjoin carriers from establishing or increasing to an unreasonable rate, at the same time leaving the matter in such shape as that the Interstate Commerce Commission may ultimately determine whether the contemplated increase is just or reasonable."

The learned judge held that the restraining order should remain in force a reasonable length of time to allow complainants to present the controversy to the Interstate Commerce Commission, and that the case should be stayed until a determination by that body as to whether the proposed increase in rates was reasonable and proper, and as to what was a reasonable rate.

This was the course taken in the Tift Case, and, as we have intimated in the ruling on the pleas to the jurisdiction, the same direction will be given now. We have no doubt that the Interstate Commerce Commission will promptly take hold of the controversy. But it is said that

the Commission can do nothing until the rates have been put into effect, and the money of the shippers collected. This is a very comfortable doctrine for the respondents. It is not, however, borne out by the conduct of the Commission in previous cases (as we understand, in the Pacific Coast Lumber Rate Case), or by the language of the act regulating commerce. Act Feb. 4, 1887, c. 104, 24 Stat. 383 [U. S. Comp. St. 1901, p. 3164]. Section 13 provides how, and by whom, complaints can be made and served, but it also declares that:

"Said Commission * * * may institute any inquiry on its own motion in the same manner and to the same effect as though complaint had been made."

The jurisdiction of the Commission is then fixed to pass upon the proceeding here. But must the Commission wait until the rate is collected? Not so. The act of Congress, known as the "Hepburn Act," amendment of Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 (U. S. Comp. St. Supp. 1907, p. 900), provides:

"That the Commission is authorized and empowered, and it shall be its duty whenever after full hearing upon a complaint, made as provided in section 13 of this Act, or upon complaint of any common carrier, it shall be of the opinion that any of the rates or charges whatsoever, demanded, charged, or collected by any common carrier or carriers subject to the provisions of this act [to act thereon, etc.]."

In addition to this, by the same section, the Commission is empowered after hearing on a complaint to establish through rates and joint rates "as the maximum to be charged," etc. Since then the Commission has the power to make the inquiry of its own motion. It is scarcely probable that it would refuse to do so at the request of shippers, directed to appear before it by a court of the United States. Since they have the power to fix the maximum rate, they can readily determine whether the increase which is threatened or "demanded," and which but for the injunction would this day have been "charged" by these respondents, is justifiable. This is a practical solution of the difficulty. To quote anew the language of the Supreme Court in the Tift Case, it is not "prejudicial" to the respondents. The Commission has the power to advance the hearing, and promptly dispose of it. Its action would thus confound the unqualified assertion of the learned counsel for the respondents here that no person who is threatened with injury of this character, no matter how ominous or odious may be the exaction, is lawfully entitled to a hearing anywhere before any tribunal, until the exaction is enforced, and his money is taken.

The rates which the defendant companies now propose to increase were fixed after careful conference by agreement with bodies of the people representing shipping interests. Under them the railroads and the country had attained a prosperity as hopeful as either had ever known. The temporary depression which ensued was not ascribable to the insufficiency of these rates. Great bodies of the people indeed insisted that they were too high, and the agitation which resulted doubtless contributed in some measure to the business depression which followed. From this the country is rapidly recuperating. The reports of stock sales and bank clearings in evidence show this to be true. It should be remembered that nothing offered by the complainants has

been in any sense contradicted or disproved. In view of the character of the discussion before the court, it is perhaps appropriate to say that the vast majority of our thoughtful people have no unkind feeling toward the railroads. Indeed, they have manifested a warm and cordial sympathy with those truly great men, of whom many hold high station in these great companies, and who toil with constancy for the betterment of their properties, and as a consequence for the welfare of the country. Significant of this disposition, by a decided majority the people have recently nominated for Governor of our state a railroad man, whose upright character, and whose complete familiarity with these and kindred topics, may give assurance that corporate, and as well private and public, interests will be lawfully conserved. And yet, while the ink is scarcely dry on his letter of acceptance, Georgia and three other Southern states, all barely convalescent from the wasting fever of panic, are threatened with an advance of rates, some of which (as it appears from the uncontradicted proof) will make the charges of transportation for the necessities of life greater than they have been in the memory of a generation. No policy could be more disastrous to the efforts of conservative government. Nor are the courts less entitled than the people to consideration from the representatives of the railway companies. When lately in North Carolina and Alabama their rates were assailed, they sought the protection of these courts. In proper cases it is always afforded them. It may be well if more temperate and considerate bearing shall obtain in their management and representation, even in those cases where they do not prevail.

In accordance with these views, an interlocutory decree will be granted, declining to dissolve the temporary restraining order now of force, and continuing the same in full effect until the further order of the court. The decree will also provide in effective terms that the complainants, and others who may have the right to intervene, shall within 10 days make complaint to the Interstate Commerce Commission; ask that body (if necessary) that it may take the initiative in this investigation, if need be, fix the maximum rates, and give such other aid and assistance to the parties in controversy and to the court as in the judgment of the Commission may seem in accordance with the law and the rights involved.